UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KIM CURTIS *and* SCOTT CURTIS,

Plaintiffs,

– *against* –

HILTON GARDEN INN NEW
YORK/CENTRAL PARK, HILTON
GARDEN INNS MANAGEMENT LLC,
MOINIAN LLC, THE MOINIAN
DEVELOPMENT GROUP LLC, 237
WEST 54TH STREET LLC, PAV-LAK
CONTRACTING INC., KOTA
DRYWALL CORP., *and* HILTON
WORLDWIDE HOLDINGS INC.,

Defendants.

**OPINION & ORDER**

18 Civ. 3068 (ER)

RAMOS, D.J.:

Kim Curtis was seriously injured when a bathroom door fell on her while she was staying at the Hilton Garden Inn New York/Central Park on West 54th Street in Manhattan. Curtis, along with her husband, brought this negligence action against several entities affiliated with the hotel. Following a six-day trial, a jury awarded Curtis $2.1 million in compensatory damages and $30 million in punitive damages. The defendants have filed multiple posttrial motions challenging the verdict.

The Court concludes that the punitive damages award is excessive and GRANTS the defendants' motions for remittitur. The defendants' other motions are DENIED.

## I.    BACKGROUND

### A.  The Defendants

Defendant Hilton Worldwide Holdings Inc. is "the parent company of the Hilton enterprise." Doc. 289 at 4. The Hilton enterprise licenses Hilton brand names—including "Hilton Garden Inn"—to third parties. *Id.* According to the joint pretrial statement, Hilton Worldwide was the franchisor for the hotel in question. Doc. 181 ¶ 7.

The Court refers to Hilton Worldwide and Hilton Garden Inns Management LLC as "the Hilton Defendants." While the Hilton Defendants maintain that they were "erroneously deemed the franchisor" based on their failure to respond to certain requests for admission, Doc. 289 at 5 n.3, they do not dispute that they must be considered franchisors for purposes of these posttrial motions, Doc. 300 at 2 n.1.

Defendants Moinian LLC, the Moinian Development Group LLC, and 237 West 54th Street LLC were the franchisees, owners, and property managers of the hotel. Doc. 181 ¶ 7. The Court refers to these entities as "the Moinian Defendants."

The Hilton and Moinian Defendants litigated this case together and were represented by the same counsel throughout the pretrial and trial proceedings. The Court refers to them collectively as "the Hotel Defendants"—which is also how they were described in the jury charge and the verdict form. Tr. 729–47, 760–75; Doc. 267.[1]

Defendant Pav-Lak Contracting Inc. served as the general contractor for construction of the hotel. Doc. 161 at 2; *see* Tr. 678–79. Pav-Lak oversaw the subcontracting of various aspects of the construction project. Doc. 161 at 2.

Defendant Kota Drywall Corp. was the project's subcontractor for carpentry and drywall. *Id.*; *see* Doc. 181 ¶ 4(c). Kota installed the bathroom door at issue in this litigation. Doc. 161 at 2.[2]

---

[1] In a transparent attempt to distance themselves from the trial proceedings, the Hilton Defendants repeatedly refer to their trial counsel as "insurer's counsel." *E.g.*, Doc. 289 at 13 n.7, 24 n.15. They assert that "this case was tried (by insurer's counsel) without the Hilton Defendants' knowledge or participation. No Hilton entity was even aware of the pre-trial motions practice or the trial itself until *after* receiving the proposed judgment." Doc. 289 at 1; *see also* Doc. 300 at 1 n.1 ("The Hilton Defendants . . . had no role whatsoever in the defense."). These assertions are not relevant to the posttrial motions. As they concede, the Hilton Defendants have been represented by counsel at every stage of these proceedings. *See* Doc. 300 at 1 n.1 ("[T]he Hilton Defendants are *not* disputing that they were represented by counsel.").

[2] Two other defendants—Five Lakes Manufacturing, Inc., and Marshfield Door Systems Inc.—were named in the original complaint. Doc. 1. All claims and crossclaims involving those defendants have since been dismissed by stipulation of the parties. Docs. 106, 131.

### B. Door Issues at the Hotel

The hotel opened to the public in early 2014.  Tr. 96.  "Barn doors" for the bathrooms were installed in approximately two-thirds of the hotel's 401 rooms.  Tr. 77.  By summer 2014—more than a year before Curtis was injured—the hotel began experiencing problems with these doors.  Tr. 96.

Manuel Cartagena testified about these door issues.  Cartagena started working at the hotel in January 2014 and was its director of engineering in September 2015.  Tr. 54–55, 77.  He was employed by Hersha Hospitality, which oversaw day-to-day management of the hotel on behalf of the Moinian Defendants.  Tr. 81.

Cartagena testified that in 2014 and 2015, issues with barn doors falling off their tracks at the hotel were "bad."  Tr. 57.  He explained:  "Our guys were running up addressing falling doors, rods hanging or sagging from the headers."  *Id.*  In fact, these doors were the "number one deficiency" in the hotel.  Tr. 57–58.  Cartagena received two or three calls a day about barn doors falling.  Tr. 96–97.  He described the continuous problems with the doors:

> My guys were going up while we would be getting calls from the front desk.  Hey, listen, there's a guest that can't get out of the bathroom or even a room attendant that can't get out of the bathroom.  The barn door fell off.  It came off its track.  The door would need to drop before it falls off, fall over and hit the wallpaper and actually rip it as well.  So we would have to run up, and then tilt the door back.  It would take two of us to actually lift the door, tilt it to the side, and start addressing the rod and clearly it was falling off as well and the handle, by the way.

Tr. 58.[3]  Cartagena also received frequent calls about door handles coming off.  Tr. 71.

According to Cartagena's testimony, "everyone" at the hotel knew about these door issues.  Tr. 76.  That included "[p]eople from Moinian," the general manager, and the front office.  Tr. 76–77.  Cartagena and his team wrote incident reports and maintained "a lot of documentation" with management.  Tr. 77.

---

[3] Cartagena testified that the doors were installed directly onto sheetrock, with no bolts or any kind of support behind the sheetrock.  Tr. 65.

Hilton knew—or should have known—about the issues as well. Cartagena explained that every Hilton property has a quality assurance inspection where "they come into the hotel and they perform an inspection based on brand standards." Tr. 83–84. Cartagena conducted these quality assurance audits with a Hilton Worldwide brand representative on a quarterly basis. Tr. 84, 104. He would present a "maintenance binder" to the Hilton representative to demonstrate that the hotel was meeting brand standards. Tr. 84–85. Those binders included reports about the issues with the barn doors, as well as records of the service calls that were made. Tr. 85–86. Hilton also required franchisees to use the "Hotel Expert" software system. Tr. 71. Every service call that Cartagena received was logged in Hotel Expert. Tr. 70.

It was clear by the fall of 2014 that the problems with the barn doors were "systemic." Tr. 103. Cartagena elevated his concerns to the hotel's general manager several times. Tr. 106. Conversations began in July 2015 about bringing in a construction team to address the door issues. Tr. 67. In August 2015, Cartagena was still waiting for hotel ownership to approve a capital project to fix the hotelwide problem with the doors. Tr. 109–11. Cartagena would have acted sooner if he had been able to sign off on the capital expenditures himself, but he had to wait for approval from ownership. Tr. 112. The capital project was finally approved in October 2015. Tr. 113.

Cartagena testified that, from March 2014 to September 2015, neither the hotel owners nor Hilton took any steps to warn guests about the doors. Tr. 131–32.

### C. The Accident and Curtis's Injuries

Curtis and her husband were guests at the hotel in September 2015. Tr. 347. No one informed the Curtises about any problems with barn doors when they checked in. Tr. 348. Upon entering their hotel room, Curtis noticed that the handle on the bathroom door was broken and was hanging off the door. Tr. 348–49. She called the front desk and was told that somebody would be sent up to fix it. Tr. 349. Again, no one mentioned the hotel's issues with barn doors. Tr. 350. The Curtises spent the evening in Times Square.

Tr. 357–58. When they returned to their room, the handle had not been fixed. Tr. 359. The next morning, the door collapsed on Curtis as she was sliding it closed. Tr. 363–64.

Curtis sustained severe injuries to her spine and knee as a result of the accident. She requires radiofrequency ablations, which involve the insertion of a probe into her spine to heat and kill nerve tissue, providing pain relief. Doc. 295-1 at 225–28. Curtis testified that the injections she receives before the ablations are "unexpectedly painful" and that it is "not uncommon for [her] to pass out during these procedures." Tr. 410–11. The ablations are a temporary measure because the nerve grows back in a span of six to eighteen months. Doc. 295-1 at 230–31. After five months, Curtis tends to experience "taser-like incidents" in her back. Tr. 404; *see id.* ("I can be sitting, and I just feel like I got stung by a wasp. . . . It grows to where the taser feeling feels a little longer than a sting."). It can be hard for her to breathe "without excruciating pain." Tr. 405. Curtis had undergone eight ablations by the time of trial and will require more in the future. Tr. 403–04. At some point, however, the ablations will become less effective, and Curtis will likely require surgery to implant a spinal cord stimulator. Doc. 295-1 at 297–300. She will also need additional procedures thereafter to maintain the implant. *Id.* at 300–01.

As for Curtis's knee injuries, the door smashed into her kneecap and caused significant cartilage damage. Tr. 242–43. At the time of trial, Curtis had already undergone one knee surgery and required additional procedures. Tr. 259–60, 272–73. One partial knee replacement has since taken place. Doc. 296 at 10. A total knee replacement will likely be necessary in the future. Tr. 279–80; *see also* Tr. 640.

At the time of the accident, Curtis was forty-eight years old. Tr. 322. She was a lifelong athlete, a track and field coach, a certified yoga instructor, and a mother of four children. Tr. 322, 323–26, 339–40, 342. Curtis is not able to teach yoga anymore. Tr. 336. On a day-to-day basis, Curtis explained, her lifestyle is necessarily more sedentary because of her injuries. Tr. 415–16. Curtis testified that she is "not the person" she was before the accident, and "nothing that I do is going to bring that person back." Tr. 417.

### D. Procedural History

*1. Pretrial*

Curtis and her husband filed this action on April 6, 2018. Doc. 1. Curtis alleged that she was injured because of (1) the negligence or recklessness of the Hilton Defendants and the Moinian Defendants in the construction, operation, and maintenance of the hotel; (2) the negligent or reckless installation of the door and hardware by Pav-Lak and Kota; and (3) the negligent manufacture of the door and hardware by Five Lakes Manufacturing, Inc., and Marshfield Door Systems Inc. *Id.* ¶ 18. Her husband brought a claim for loss of consortium. *Id.* ¶¶ 21–24.

Several answers and crossclaims followed. Pav-Lak answered the complaint and asserted a crossclaim against the other defendants. Doc. 46. The Hotel Defendants collectively filed an answer. Doc. 49. They brought crossclaims against the other defendants as well. *Id.* Pav-Lak answered the Hotel Defendants' crossclaims. Doc. 54. Kota did not answer or otherwise appear. In October 2018, the Curtises obtained a clerk's certificate of default as to Kota. Doc. 62.

The parties engaged in discovery for almost three years. Pav-Lak moved for summary judgment in February 2022. Doc. 151. The Court granted the motion with respect to the Curtises' claims against Pav-Lak but denied the motion with respect to the crossclaims against Pav-Lak. Doc. 161 at 9; *see Curtis v. Hilton Garden Inn New York/Central Park*, No. 18 Civ. 3068 (ER), 2022 WL 4095905 (S.D.N.Y. Sept. 7, 2022).

The parties filed a joint pretrial statement in September 2023. Doc. 181. After an adjournment of the trial date, the Court held the final pretrial conference on April 25, 2024. Doc. 265. Counsel appeared on behalf of the Curtises, the Hotel Defendants, Pav-Lak, and Kota. *Id.* at 2. The Court expressed its surprise at Kota's appearance on the eve of trial, and counsel for the Curtises said she had not received any notice that Kota would be present. *Id.* at 2–5. Counsel for Kota eventually clarified: "We're not part of this action. I was sent down to offer money and settle." *Id.* at 9.

The Court ruled on various objections to deposition designations and motions to exclude certain testimony that are not relevant here. *Id.* at 16–35. The Court then turned to the Curtises' motion for sanctions. *See* Doc. 213. According to the Curtises, the Hotel Defendants asserted in response to May 2019 interrogatories that the door in question "was never modified or replaced." Doc. 214 at 1. The Hotel Defendants stated that there had never been any plans to modify the hundreds of barn doors on the property. *Id.* at 4–5. They also denied having any maintenance or incident reports related to issues with barn doors. *Id.* at 6.

The Curtises eventually tracked down Cartagena, who had time-stamped photographs on his phone documenting problems with the barn doors well before Curtis was injured. *Id.* at 9–11. Those photographs showed barn doors sliding off their tracks, broken door handles, and broken wheels. *Id.* at 11; Tr. 60–69. Some of these pictures were taken the day before the Curtises checked into the hotel. Doc. 214 at 11–12; Tr. 69–72. Additionally, in a declaration supporting one of their motions in limine, the Hotel Defendants claimed that the door in question had in fact been subject to remediation—a complete reversal from the position they had taken during discovery. Doc. 214 at 1–2.

The Curtises moved for sanctions, asserting that the Hotel Defendants' misrepresentations had "fundamentally altered the trajectory of this litigation." *Id.* at 2. They also accused the defendants of spoliation and of engaging in a pattern of obstructive conduct. *Id.* The Curtises asked the Court to permit all evidence of subsequent remedial measures and to give the jury an adverse inference charge on the spoliated evidence. *Id.*

Since the Hotel Defendants did not dispute that their initial representations had been inaccurate, the Court granted the motion. Doc. 265 at 35. When asked about the requested sanctions, counsel for the Hotel Defendants stated: "Your Honor, to be very honest with you, I don't have a position on that. It is what it is. I can't defend what my clients did as far as that's concerned." *Id.* at 36. The Court therefore granted the

Curtises' request to permit evidence of remedial measures and to provide an adverse inference charge. *Id.*

The Hotel Defendants also argued that Kota should be included on the verdict form. *Id.* at 52. The Court deferred its ruling on that issue and on whether a punitive damages question would be included on the verdict form. *Id.* at 55, 57.

2. *Trial*

Trial began on April 29, 2024. The Court held the final charge conference on the afternoon of May 2. The Court ruled, over the Hotel Defendants' objection, that Kota would not appear on the verdict form. Doc. 276 at 558. The Court included a question on punitive damages, again over the objection of the Hotel Defendants. *Id.* at 570. With respect to the proposed spoliation instruction, the Hotel Defendants objected to the use of the word "willfully" in the phrase "willfully failed to preserve [evidence]." Tr. 577. The Court overruled that objection as well. *Id.*

The Curtises rested on May 3. Tr. 621. At that time, they moved for judgment as a matter of law on their negligence and punitive damages claims and on any contributory negligence claims by the Hotel Defendants against Kota. Tr. 622–23. The Hotel Defendants and Pav-Lak opposed those motions. Tr. 624. The Court took the motions under advisement. *Id.* Both the Hotel Defendants and Pav-Lak rested later that day. Tr. 727. The Court asked counsel if they had any motions. Tr. 728. Pav-Lak moved for a directed verdict, and the Court took that motion under advisement as well. *Id.* Counsel for the Hotel Defendants declined to make any motions. *Id.*

The Court then delivered the jury charge. The Court gave the jury the following spoliation instruction:

> Before this trial began, the Court held that the Hotel Defendants willfully failed to preserve: (1) maintenance and trend reports as to the bathroom barn doors from Hotel Expert, the hotel's document maintenance software; (2) incident reports for guests injured by doors; (3) emails by Manuel Cartagena as to concerns regarding the doors and the implementation of the capital project to reinstall them;

(4) records and documents related to the capital project; (5) binders submitted by Manuel Cartagena on behalf of the hotel's maintenance department for the quarterly Hilton quality assurance audits; (6) phone records from September 3, 2015, to demonstrate the call Mrs. Curtis made to the front desk regarding the door; and (7) the door itself.

I also found that this evidence would have been important to the issues regarding (1) whether the bathroom doors were reasonably safe; (2) what the Hotel Defendants knew or should have known as to the risks of the doors coming off their track; and (3) whether the Hotel Defendants acted with reasonable care to correct the doors or to take other suitable precautions. You should, therefore, presume that had this evidence been preserved, the evidence would have been important to these three issues, and it would have been adverse to the Hotel Defendants' position.

Tr. 769–70.

On May 6, the jury returned a unanimous verdict for Curtis. The jury answered the questions on the verdict form as follows:

**QUESTION 1:**

**PART ONE**

Has Mrs. Curtis proven by a preponderance of the evidence that the Hotel Defendants negligently allowed a bathroom door condition to exist that was not reasonably safe at the time of the accident?

YES.

**PART TWO**

Has Mrs. Curtis proven by a preponderance of the evidence that the Hotel Defendants' negligence was a substantial factor in bringing about her injuries?

YES.

**QUESTION 2:**

State the amount you award, if any, for Mrs. Curtis' past pain and suffering from the incident on September 4, 2015 to today. If you do not award any damages, write "none."

$250,000.

**QUESTION 3:**

State separately the amount you award, if any, for the following items of damages that Mrs. Curtis is likely to incur and/or suffer in the future. If you award damages, also state the period of years over

which such is intended to provide compensation.  If you do not award any damages as to any item, write "none."

> Medical Expenses:  $830,262 over 27.5 years.

> Rehabilitation Services:  $45,410 over 27.5 years.

> Pain and Suffering:  $1,000,000 over 27.5 years.

## QUESTION 4:

### PART ONE

Has Mrs. Curtis proven by a preponderance of the evidence that the Hotel Defendants acted wantonly and recklessly?

> YES.

### PART TWO

What amount, if any, do you award in punitive damages as to the Hotel Defendants?

> $30 million.

## QUESTION 5:

Have the Hotel Defendants proven by a preponderance of the evidence that they are entitled to a contractual indemnification from Pav-Lak Contracting, Inc.?

> NO.

Doc. 267.

*3. Posttrial*

Multiple posttrial motions have been filed.  First, the Hilton Defendants—represented by new posttrial counsel—move for judgment as a matter of law.  Doc. 289. They argue that Curtis failed to prove the Hilton Defendants' negligence and that the punitive damages award against them cannot stand.  In the alternative, the Hilton Defendants contend that they are entitled to a new trial or remittitur.  They assert that (1) a new trial is warranted given the absence of evidence against them; (2) the spoliation finding and corresponding instruction were improper; (3) the compensatory damages award was excessive; (4) the joint and several punitive damages award was improper; (5) the punitive damages award was excessive; and (6) the exclusion of Kota from the verdict form was improper.

In their own motion, the Moinian Defendants raise three of the same issues: (1) the joint and several punitive damages award was improper; (2) the punitive damages award was excessive; and (3) the exclusion of Kota from the verdict form was improper. Doc. 292.

Opposing these motions, Curtis argues that (1) the Hotel Defendants waived apportionment arguments; (2) the Hilton Defendants have no individual defense to the verdict, and the spoliation finding should not be disturbed; (3) deference should be shown to the compensatory damages award; (4) deference should be shown to the punitive damages award; (5) the omission of Kota from the verdict form does not warrant a new trial; and (6) the verdict should be certified as final. Doc. 296.

Finally, Pav-Lak opposes the Hotel Defendants' posttrial motions to the extent a new trial on liability would involve adjudicating those defendants' crossclaims against Pav-Lak. Doc. 298.

## II.    DISCUSSION

### A.  Judgment As a Matter of Law or New Trial

The Hilton Defendants move for judgment as a matter of law with respect to both negligence and punitive damages. Doc. 289 at 7–14. Federal Rule of Civil Procedure 50 provides that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). "The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment." *Id.* After entry of judgment, "the movant may file a renewed motion for judgment as a matter of law." Fed. R. Civ. P. 50(b). "The principal purpose of the requirement that any such motion be made before the case is submitted to the jury is to assure the responding party an opportunity to cure any deficiency in that party's proof." *Lore v. City of Syracuse*, 670 F.3d 127, 152 (2d Cir. 2012) (internal quotation marks and citation omitted). "As to any issue on which proper Rule 50 motions were not made, [judgment as a matter of law] may not properly be granted by the district court, or upheld on appeal, or ordered by the

appellate court unless that action is required in order to prevent manifest injustice." *Id.* at 153.

The manifest injustice test is difficult to satisfy. "Manifest injustice exists where a jury's verdict is wholly without legal support." *ING Global v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014). In deciding a Rule 50 motion, the court is required to "consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in [its] favor from the evidence." *Id.* (alteration in original) (internal quotation marks and citation omitted).

The manifest injustice standard applies here because the Hilton Defendants never moved for judgment as a matter of law. The Hilton Defendants suggest that counsel did make a Rule 50 motion or that the transcript is "ambiguous." Doc. 300 at 2 n.1. The transcript is not ambiguous. Counsel for the Curtises clearly moved for judgment as a matter of law on the negligence and punitive damages claims. Tr. 622. In response, counsel for the Hotel Defendants cited Cartagena's testimony, claiming it showed that "the hotel would not have rented a room if they knew a room was dangerous" and that "if a room was found to be dangerous, it would be taken out of service." Tr. 624. Counsel also characterized Cartagena's testimony as indicating that "although some issues developed with doors, he did not learn of the major issues of the doors falling off until some time later." *Id.* Counsel for Pav-Lak then stated: "I join in [counsel for the Hotel Defendants'] opposition." *Id.*

The statements made by counsel for the Hotel Defendants are far too general to be characterized as a Rule 50 motion for judgment as a matter of law. *See, e.g., Greenaway v. County of Nassau*, 327 F. Supp. 3d 552, 561 (E.D.N.Y. 2018) ("[A] motion for judgment as a matter of law 'must at least identify the specific element that the defendant contends is insufficiently supported.'" (citation omitted)). After the Hotel Defendants and Pav-Lak rested, moreover, the Court asked counsel if they wanted to make any motions.

Tr. 728.  Counsel for Pav-Lak moved for a directed verdict.  *Id.*  Counsel for the Hotel
Defendants expressly declined to make any motions.  *Id.*  Accordingly, the manifest
injustice standard applies.[4]

In the alternative, the Hilton Defendants move for a new trial based on "the
absence of evidence" against them.  Doc. 289 at 14–15.  Under Rule 59, "[t]he court may,
on motion, grant a new trial on all or some of the issues . . . after a jury trial, for any
reason for which a new trial has heretofore been granted in an action at law in federal
court."  Fed. R. Civ. P. 59(a)(1)(A).  A new trial should be granted only where "the jury
has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice."
*Newton v. City of New York*, 171 F. Supp. 3d 156, 164 (S.D.N.Y. 2016) (omission in
original) (citation omitted); *see also, e.g.*, *Rosello v. Long Island R.R. Co.*, 50 F. Supp. 3d
242, 249 (E.D.N.Y. 2014) ("[T]he granting of a new trial is an extraordinary relief, and
one that 'is properly granted only upon a showing of exceptional circumstances.'"
(quoting *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 391 (2d Cir. 2001))).

   *1.  Negligence*

"To establish a prima facie case of negligence, a plaintiff must demonstrate (1) a
duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury
proximately resulting therefrom."  *Hammonds v. Burlington Coat Factory Warehouse
Corp.*, 708 F. Supp. 3d 446, 448 (S.D.N.Y. 2023) (quoting *Solomon v. City of New York*,

---

[4] The Hilton Defendants maintain that a "de novo" standard applies to some of their arguments for
judgment as a matter of law.  *See* Doc. 289 at 10 n.6 ("Trial counsel's motion for a directed verdict fairly
encompasses the argument that the defendants did not breach a duty of care."); *id.* at 13 n.7 ("Insurer's
counsel repeatedly objected to the sufficiency of the punitive damages evidence, rendering this argument
subject to *de novo* review.").  To reiterate, the manifest injustice standard governs all these arguments
because the Hilton Defendants failed to make a pre-verdict motion.  Even if they had made such a motion,
however, this Court would not review the jury's verdict "de novo."  "A court may only grant a Rule 50(b)
motion if there is 'such a complete absence of evidence supporting the verdict that the jury's findings could
only have been the result of sheer surmise and conjecture, or the evidence in favor of the movant is so
overwhelming that reasonable and fair minded [persons] could not arrive at a verdict against [it].'"
*Canjura v. Laschet*, No. 12 Civ. 1524 (JCM), 2016 WL 2755920, at *3 (S.D.N.Y. May 10, 2016)
(alterations in original) (quoting *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 112 (2d Cir. 2015)).  In
evaluating such a motion, the court "cannot assess the weight of conflicting evidence, pass on the
credibility of witnesses, or substitute its judgment for that of the jury."  *Id.* (quoting *Wiercinski*, 787 F.3d at
113).  The Hilton Defendants' motion would fail under this standard as well.

489 N.E.2d 1294, 1294 (N.Y. 1985)).  The Hilton Defendants challenge the duty and breach elements.  Doc. 289 at 7–13.

As a preliminary matter, it is worth emphasizing that this is the first time in the history of this six-year-old case that the Hilton Defendants have suggested they did not have a duty to Curtis and did not breach any duty.  They did not move to dismiss or move for summary judgment on these grounds.  They did not move for judgment as a matter of law at the close of evidence.  And in closing arguments, counsel for the Hilton Defendants did not say a word about duty or breach; he focused instead on Kota's culpability and the extent of Curtis's injuries.  It is well settled that a posttrial motion "is not a vehicle for . . . presenting the case under new theories."  *Ojeda v. Metro. Transp. Auth.*, 477 F. Supp. 3d 65, 76 (S.D.N.Y. 2020) (quoting *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 144 (2d Cir. 1998)).  The Court could deny the motions on this basis alone. *See, e.g.*, *Barton Grp., Inc. v. NCR Corp.*, 796 F. Supp. 2d 473, 497 (S.D.N.Y. 2011) ("A party cannot maintain a Rule 59 motion insofar as it is based on a new legal theory that it did not present at trial."); *Baker v. Dorfman*, No. 97 Civ. 7512 (DLC), 1999 WL 191531, at *3 (S.D.N.Y. Apr. 6, 1999) (holding that defendant had waived argument raised in Rule 59 motion by failing to present it to the court or jury during trial); *see also Greenaway*, 327 F. Supp. 3d at 566 (denying Rule 50 motion where defendants failed to raise arguments at trial).

On the merits, the Hilton Defendants maintain that they did not owe Curtis a duty of care.  Doc. 289 at 7.  They assert that the Moinian Defendants owned the hotel and controlled its operation and management.  *Id.* at 8.  The Hilton Defendants, on their account, did not exercise any control over the design, installation, maintenance, or repair of the barn doors.  *Id.*  While the Hilton Defendants do not dispute their status as franchisors for purposes of these motions, they insist that a franchisor's right to enforce brand standards does not give rise to a duty under New York law.  *Id.* at 9–10.  The Hilton Defendants also contend that they did not breach any duty owed to Curtis because they

had no role in installing the doors and had no actual or constructive knowledge of the dangerous condition. *Id.* at 10–13.

These arguments fail for at least two reasons. First, both the Curtises and the Court anticipated this line of reasoning at a discovery conference in November 2019. Doc. 122. Counsel for the Curtises explained that they were asking the Hotel Defendants to produce the relevant franchise agreement in order to ascertain the responsibilities of the various parties. *Id.* at 10. Counsel also asserted that "should the defendants later seek to defend themselves and say that Hilton is not responsible for this, then I think at this point if they are not going to give me this document, they should be estopped from doing so." *Id.* at 10–11. The Court stated: "That makes sense to me . . . ." *Id.* at 11.

Counsel for the Hilton Defendants responded that the franchise agreement "does not specify a door in the bathroom" and "is merely a granting of the license in the franchise to use their name." *Id.* The Court told counsel for the Hilton Defendants: "[I]f it is going to be your position that [the franchise agreement is] not relevant, then you will be estopped later on from asserting that you are not liable on the basis that that responsibility was given to the franchisee in that agreement." *Id.* Counsel for the Hilton Defendants again stated that there was "no need for this document" because "we did not deny ownership of the property" and "[w]e are not denying liability in terms of we have to operate and maintain the hotel." *Id.* at 11–12. The Court reiterated:

> [W]hat you cannot do is say we are not giving over this agreement which maybe lays out the responsibilities, the distribution of responsibilities for maintenance of the property as between the parties to the franchise agreement, and then later say, well, you may have established liability, but you've got the wrong party. . . .
>
> I am trying to make this as simple as possible. If you are not going to turn over the franchise agreement, you cannot argue that, notwithstanding the fact that plaintiff was able to establish liability on the part of the owners or operators of the property, that they cannot get money from your particular client, because in the franchise agreement, maintenance of the property was clearly delegated to the franchisee.

*Id.* at 12–13.  Counsel for the Hilton Defendants responded:  "Certainly."  *Id.* at 13.

The Hilton Defendants are now attempting to do exactly what the Court warned would be impermissible.  After refusing to turn over the franchise agreement, the Hilton Defendants are essentially arguing that Curtis "may have established liability, but [has] got the wrong party."  The Hilton Defendants insist that while "[c]ounsel may have waived arguments based on the franchise agreement's terms, . . . the evidence at trial, which Curtis cannot disavow, *proved* Hilton's lack of control."  Doc. 300 at 3 n.4.  But the point is that the franchise agreement likely contained important information about the relationship between the Hilton entities and the Moinian entities and the degree to which Hilton exercised control over the hotel.  Because the Hilton Defendants refused to produce the agreement, the Court is not able to thoroughly analyze what degree of control it provides for—as courts typically do when evaluating similar arguments.  *See, e.g.*, *Wendy Hong Wu v. Dunkin' Donuts, Inc.*, 105 F. Supp. 2d 83, 90–91 (E.D.N.Y. 2000).  As the Court expressly warned five years ago, the Hilton Defendants cannot now take advantage of their refusal to produce the agreement by arguing that they did not have sufficient control.  *See* Doc. 122 at 12–13; *cf. Repeti v. McDonald's Corp.*, 855 N.Y.S.2d 281, 283 (App. Div. 2008) (where defendant failed to include franchise agreement in its papers, court could not conclude as a matter of law that defendant lacked requisite control over facility to give rise to a duty); *Anderson v. Marriott Int'l, Inc.*, No. 11-24326, 2015 WL 5283304, at *5 (N.Y. Sup. Ct. Aug. 26, 2015) ("Marriott's contention that . . . the plaintiff cannot successfully oppose its motion or raise the issue of the standards imposed by Marriott, is belied by the fact that Marriott has failed to submit a copy of the [Marriott Inn Standard Operating Procedures] in its reply.").

Second, even without the franchise agreement, the jury's verdict finding the Hilton Defendants liable for Curtis's injuries does not constitute a manifest injustice. There was ample evidence in the record to support a finding that the Hilton Defendants owed a duty to Curtis and breached that duty by allowing the barn doors to exist in an

unsafe condition. For one, the Hilton Brand Standards—which were admitted at trial, Tr. 138—set out specific instructions concerning maintenance of the hotel. These brand standards "provide the Franchisee/Owner with the required standards, procedures, rules, regulations, policies, and techniques" concerning the hotel. Doc. 297-3 at x. They also state that the franchisee "must comply with and maintain the standards set out in the Manual." *Id.* And the franchisee's violation of the brand standards "could be deemed a substantial and material violation or default of" the franchise agreement. *Id.*; *see also* Tr. 136–37 (Moinian executive testifying that hotel had to comply with brand standards and that failure to do so could result in loss of license as Hilton franchisee).

The Hilton Brand Standards also include detailed safety requirements. They require each hotel to implement a "quality control system," which "must be designed to ensure that the hotel is maintained in quality condition." Doc. 297-3 at 1600-2. The hotel must be inspected four times per year. *Id.* That is consistent with Cartagena's testimony that Hotel Expert was installed to comply with the standards and that "preventative maintenance had to be documented for quality assurance per Hilton requirements." Tr. 71, 83. Cartagena testified that Hilton representatives performed the required quarterly audits and received binders filled with reports about barn door issues. Tr. 86, 104. The brand standards confirm that hotels need to keep audit records on file "for review by Hilton Worldwide quality assurance auditors for a period of no less than three years." Doc. 297-3 at 1500-8.

The standards provide specifications as to barn doors as well. Each room is required to have barn doors with an "[e]xposed roller rail system." *Id.* at 2500-68. And the Hotel Expert system would have reflected that barn doors presented the "number one" issue at the hotel. Tr. 89–90; *see also* Tr. 167, 170 (Moinian executive testifying that Hilton never raised a concern about the barn doors before September 2015 and agreeing that if "the hotel did nothing to fix the barn doors during that period of time," that would have been reckless).

In light of all this evidence, the Court cannot say that the jury's verdict was "wholly without legal support."  It was not unreasonable for the jury to conclude that the Hilton Defendants exercised control over the property, that they were on notice of issues with the barn doors, and that they allowed the doors to exist in an unsafe condition.  *See Toppel v. Marriott Int'l, Inc.*, No. 03 Civ. 3042 (DAB), 2006 WL 2466247, at *6 (S.D.N.Y. Aug. 24, 2006) (denying hotel franchisor's motion to dismiss where franchise agreement required franchisee to abide by certain standards and imposed specific requirement regarding lighting around restaurant where plaintiff's injury occurred); *Vaughn v. Columbia Sussex Corp.*, No. 91 Civ. 1629 (CSH), 1992 WL 18843, at *5 (S.D.N.Y. Jan. 28, 1992) (denying hotel franchisor's motion for summary judgment where license agreement "guarantee[d] substantial control by the franchisor," who could "inspect the hotel at any time and order upgrading and rehabilitation pursuant to the franchisor's own standards"); *Hilton v. Holiday Inns, Inc.*, No. 87 Civ. 1958 (MJL) 1990 WL 113133, at *3 (S.D.N.Y. Aug. 1, 1990) (denying hotel franchisor's motion for summary judgment where franchisor "require[d] each licensee to conform to certain minimum standards").[5]

### 2.  Punitive Damages

The Hilton Defendants also move for judgment as a matter of law with respect to punitive damages.  Doc. 289 at 13–14.  In another attempt to lower their legal burden, the Hilton Defendants assert that their counsel "repeatedly objected to the sufficiency of the punitive damages evidence, rendering this argument subject to *de novo* review."  *Id.* at 13 n.7.  To be sure, counsel for the Hilton Defendants objected to the inclusion of the

---

[5] Curtis also argues that the Hilton Defendants may be held vicariously liable on a theory of apparent authority because Hilton solicited Curtis's visit to the hotel through a telemarketing call.  Doc. 296 at 28–29.  The Hilton Defendants insist that Curtis failed to raise this vicarious liability theory at trial or earlier. Doc. 300 at 4.  Of course, Curtis likely did not develop the theory because the Hilton Defendants never even hinted that they were contesting duty or breach.  *Cf.* Doc. 122 at 12 (Counsel for the Hilton Defendants stating:  "We are not denying liability in terms of how we have to operate and maintain the hotel.  We'll be denying liability how the incident happened.").  In any event, the Court need not decide whether this theory is viable; the Hilton Defendants' arguments fail for the other reasons discussed above.

punitive damages charge.  Tr. 310 (objecting to the charge because Cartagena's testimony "was that the hotel would not rent out a room that was known to be dangerous"); Tr. 776 (raising the same objection after the Court read the jury charge).  But counsel never made a Rule 50 motion for judgment as a matter of law.  *See* Tr. 728 (declining to make any motions).  And counsel failed to "specify the judgment sought and the law and facts that entitle the movant to the judgment," as Rule 50 requires.  Fed. R. Civ. P. 50(a)(2); *see, e.g.*, *Lore*, 670 F.3d at 152 ("[T]he specificity requirement is obligatory." (alteration in original) (citation omitted)).

Separately, even if the Court liberally construed these objections as constituting a Rule 50 motion, the argument now raised by the Hilton Defendants could not be fairly characterized as a *renewed* motion for judgment as a matter of law.  After Cartagena testified, the Hotel Defendants objected to the inclusion of the punitive damages question on the verdict form.  Tr. 310.  Counsel argued that Cartagena's testimony indicated that "the hotel would not rent out a room that was known to be dangerous" and that any room with an issue would have been "taken out of service and repaired."  *Id.*  Counsel continued:  "[Cartagena] said the work started in September [2015].  It's not like he knew about it in March of 2014, they sat on their hands for a year and a half, rented rooms that they knew were potentially dangerous, and then the incident occurs."  Tr. 311; *accord* Tr. 776.  The posttrial argument advanced by the Hilton Defendants is completely different; they maintain that the Hilton entities had no specific role in any wrongdoing related to the doors.  Doc. 289 at 13–14.  A motion for judgment as a matter of law is not properly preserved where the posttrial argument was not included in the party's original Rule 50 motion.  *See, e.g.*, *Lore*, 670 F.3d at 153 (concluding that posttrial argument was not preserved because it "was not a renewal of any argument made in the [defendant's] Rule 50(a) motion, and its assertion postverdict plainly did not give [the plaintiff] the requisite opportunity to cure any perceived deficiency in her proof before the case was submitted to the jury"); *Buchwald v. Renco Grp.*, 539 B.R. 31, 48 (S.D.N.Y. 2015) ("This argument

was not made in Defendants' Rule 50 motion during trial, and therefore is not preserved

for a post-trial motion."). Accordingly, the manifest injustice standard applies.[6]

The Hilton Defendants have not satisfied that standard. At trial, the Court ruled as

follows on the objection to the punitive damages charge:

> I agree that there is a basis in the record at this point to allow the jury to consider punitive damages. I know that there is some issue concerning exactly who knew what when, but Mr. Cartagena testified fairly clearly that the issues with the doors began fairly shortly after the hotel began operating.

> Now, I think the earliest of the pictures that he has from his phone may be July of 2015, which, obviously, is some period of time after the hotel began, but he testified that it was an ongoing issue, he testified that it was elevated up to as high, at least, as Mr. Gericke, that it was put on to Hotel Expert. And, obviously, Mr. Gericke, I had my own view about his testimony, but he didn't deny that if things occurred in the way that Mr. Cartagena testified to, then that would have been reckless, that would have put hotel guests in danger. And the fact was that notwithstanding Mr. Cartagena's testimony that, yeah, you know, if there was a dangerous room, they wouldn't use it, even after July 2015, when we have our earliest photos, a room with one of those doors actually was rented to Mr. and Mrs. Curtis. So that sort of indicates that the hotel wasn't doing what [counsel for the Hotel Defendants] is suggesting and what perhaps the testimony suggested, that if there were a dangerous room, it would be taken out of circulation.

> The room was in circulation. They were already aware of the situation with the doors. And in the back of all this, of course, is the spoliation issue. You know, we don't know exactly when and where and how these things were documented because the documents were gotten rid of or destroyed or I have no idea, but we don't have them. And so I think that based on the totality of the evidence that's before the jury, they are entitled to consider punitive damages.

Tr. 313–14.

The Court sees no basis to depart from that conclusion. The Hilton Defendants

argue that (1) no Hilton entity had any involvement with the door's design, installation,

or maintenance; (2) no Hilton entity had actual or constructive knowledge of the door's

---

[6] Again, the legal standard is not dispositive. Even if the Court applied the more lenient Rule 50 standard for a renewed motion for judgment as a matter of law, the motion would fail for the same reasons.

condition; and (3) no Hilton entity could have repaired the door.  Doc. 289 at 13.  But Cartagena testified that he was subject to quarterly audits with Hilton representatives, and he prepared binders full of reports showing all the problems the hotel was having with barn doors.  The jury could have reasonably concluded from this evidence that the Hilton Defendants knew or should have known about the systemic door issues.  And the jury could have reasonably found that the Hilton Defendants recklessly disregarded those issues and failed to take any corrective measures.  The jury's verdict awarding punitive damages based on the Hilton Defendants' conduct was not "wholly without legal support."

\*    \*    \*

The Hilton Defendants' motions for judgment as a matter of law fail under any standard.  Those motions are denied.  As noted above, the Hilton Defendants move in the alternative for a new trial based on "the absence of evidence" against them.  *Id.* at 14–15.  That request is denied for the same reasons.  *See, e.g.*, *Haidon v. Danaher*, No. 19 Civ. 119 (SRU), 2024 WL 3982880, at *14 (D. Conn. Aug. 29, 2024) ("Despite that the standard for granting a new trial under Rule 59 is less stringent than the Rule 50 standard for judgment as a matter of law, the weight of the evidence presented at trial clearly supports the jury's verdict for the same reasons as described above."); *Munoz v. Manhattan Club Timeshare Ass'n, Inc.*, No. 11 Civ. 7037 (JPO), 2014 WL 4652481, at *3 n.4 (S.D.N.Y. Sept. 18, 2014) (holding that defendant was not entitled to a new trial "[f]or the same reasons" that it was not entitled to judgment as a matter of law).

### B.  Spoliation

Next, the Hilton Defendants take issue with the spoliation sanction.  They argue that a new trial is warranted because the proceedings were "tainted" by the Court's "improper finding and instruction on spoliation."  Doc. 289 at 15.

"The court should order a new trial if the jury instructions were erroneous, and such error may have influenced the jury's verdict."  *Stowe v. Nat'l R.R. Passenger Corp.*,

793 F. Supp. 2d 549, 559 (E.D.N.Y. 2011).  Rule 51 "requires 'a party in a civil action

[to] make specific objections to jury instructions before the jury retires to deliberate.'"

*O'Connell v. Onondaga County*, No. 09 Civ. 364 (FJS), 2013 WL 998598, at *5

(N.D.N.Y. Mar. 13, 2013) (alteration in original) (quoting *Fashion Boutique of Short

Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 61 (2d Cir. 2002)).  "A party's failure to assert

a timely objection results in a waiver of that objection." *Id.* (citing *Jarvis v. Ford Motor

Co.*, 283 F.3d 33, 57 (2d Cir. 2002)).  "In the absence of a party's timely objection to a

verdict form, a Court's review is limited to the determination of whether the jury

instruction or verdict sheet contained a fundamental error." *Webber v. Dash*, 607 F. Supp.

3d 407, 415 (S.D.N.Y. 2022) (internal quotation marks and citation omitted).  "An error is

fundamental when it is so serious and flagrant that it goes to the very integrity of the trial

and includes an error which deprive[s] the jury of adequate legal guidance to reach a

rational decision." *Id.* (alteration in original) (internal quotation marks and citation

omitted).

　　　The Hilton Defendants insist that their counsel "repeatedly objected to the

spoliation finding and the adverse-inference instruction due to the absence of proof of

spoliation."  Doc. 289 at 15 n.8 (citing Tr. 575).  And on the merits, the Hilton

Defendants maintain that they never possessed or maintained the records in question,

which they claim were controlled by Hersha—the Moinian Defendants' management

company.  *Id.* at 15–16.  Since the Hilton Defendants did not possess or control the

documents, they reason, there was no duty to preserve and thus no basis for a spoliation

finding.  *Id.* at 16.

　　　As a preliminary matter, it is not true that the Hilton Defendants "repeatedly

objected to the spoliation finding."  The Curtises moved for sanctions in September 2023.

Doc. 213.  The Hotel Defendants filed a cursory, four-page opposition stating that the

Curtises had not satisfied the requirements for an adverse inference instruction.  Doc.

217.  At the final pretrial conference, however, counsel for the Hotel Defendants did not

oppose the Curtises' request to permit evidence of remedial measures and to provide an adverse inference charge. Counsel stated: "Your Honor, to be very honest with you, I don't have a position on that. It is what it is. I can't defend what my clients did as far as that's concerned." Doc. 265 at 36. The Court granted the motion for sanctions. *Id.*

At the charge conference, counsel for the Hotel Defendants raised a narrow objection to the following proposed language in the draft instructions: "the Hotel Defendants willfully destroyed and failed to preserve [evidence]." Tr. 575. Counsel argued that there was no testimony indicating that evidence had been "willfully destroyed." *Id.* He added: "I think my clients are in a bad enough light as it is without the Court saying something was willfully destroyed." *Id.* The Court responded:

> Mr. Cartagena's testimony suggests, at the very least, that he and others documented on Hotel Expert reports of incidents concerning individuals, including guests and workers, at the hotel having difficulties with the doors, whether they be entrapped or whatnot. He indicated that there were entries made on Hotel Expert concerning the difficulties, the problems they were having with the failure of the doors to remain affixed to the headers. So there's testimony that all of that information existed once upon a time. He testified about the binders.

> There's nothing to rebut that testimony, which leads to the logical conclusion that that [evidence] existed once upon a time, and that the Hotel Defendants failed at the very least to preserve it. So again, I agree there's language that I could use that could soften this, but the basic message to the jury is that I found that the Hotel Defendants failed to preserve clearly relevant evidence and, therefore, you should assume that it would have been adverse to their position.

Tr. 576. Counsel for the Hotel Defendants then reiterated that he was objecting to the "willfully destroyed" language. *Id.* The Court agreed to remove that language. *Id.* But the Court did include language—over the Hotel Defendants' objection—stating that the Hotel Defendants "willfully failed to preserve" evidence. Tr. 577. Counsel did not raise any other objections to the spoliation instruction. The Court therefore instructed the jury that the Hotel Defendants "willfully failed to preserve" the evidence in question. Tr. 769.

In sum, counsel for the Hotel Defendants did not object at all when the Court granted the motion for sanctions—and in fact conceded that his clients' behavior was indefensible.  And counsel raised only a very narrow objection to the instruction itself. Counsel did not make any kind of argument even remotely resembling the Hilton Defendants' posttrial contention that the spoliation charge was improper because the Hilton entities had no role in any discovery misconduct.  As a result, the argument has been waived or forfeited.  *See, e.g.*, *Gelb v. Bd. of Elections of City of New York*, 47 F. App'x 10, 11 (2d Cir. 2002) ("In general, objections to jury instructions are waived if they are not made contemporaneously.").

In any event, the spoliation finding and the corresponding instruction were not erroneous—and they certainly do not rise to the level of a fundamental error.  A party requesting an adverse inference instruction based on the destruction of evidence must show "(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense." *Chin v. Port Auth. of New York & New Jersey*, 685 F.3d 135, 162 (2d Cir. 2012).

The Hilton Defendants argue that they never possessed the maintenance records or audit binders, which they claim were controlled by Hersha.  Doc. 289 at 15–16.  But "[a] party has control over documents held by a non-party if it has the legal right or practical ability to obtain documents from [that] non-party."  *Signify N. Am. Corp. v. Satco Prods., Inc.*, No. 19 Civ. 6125 (JMA) (SIL), 2020 WL 9455192, at *2 (E.D.N.Y. Oct. 22, 2020) (second alteration in original) (internal quotation marks and citation omitted).  Here, as discussed above, the Hilton Brand Standards required Hilton properties to maintain Hotel Expert software, required quarterly audit presentations with Hilton representatives, and required that audit records remain on file for three years for review by Hilton auditors. While the Hilton Defendants argue that the audits were discretionary, Doc. 300 at 6, the

brand standards suggest that Hilton could have obtained the documents in question from Hersha. In fact, the Hilton Defendants joined the Moinian Defendants in designating a Hersha employee as a Rule 30(b)(6) witness to respond to interrogatories on behalf of all the Hotel Defendants. Doc. 221 at 2. If the Hilton Defendants—or their counsel—were able to engage a Hersha employee to sit for a deposition and respond to discovery requests, it is hard to see why they could not have asked Hersha to produce and preserve relevant evidence. And the Hilton Defendants had "a duty to initiate a 'litigation hold' and preserve potentially responsive documents" once they learned of the accident. *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 197 (S.D.N.Y. 2007); *see also Prelvukaj v. Naselli*, No. 19 Civ. 05939 (RPK) (PK), 2023 WL 3570659, at *6 (E.D.N.Y. May 18, 2023) ("[T]he duty to preserve requires that litigants 'take affirmative steps to prevent inadvertent spoliation.'" (citation omitted)). The Hilton Defendants did not comply with that obligation.

As for the "culpable state of mind" requirement, the Hilton Defendants argue—for the first time—that they reasonably relied on the hotel owner and operator to maintain hotel records. Doc. 289 at 16. As the Second Circuit has explained, however, "the 'culpable state of mind' for a spoliation claim need not be intentional or willful, and may be found where the spoliation occurs due to negligence." *Rossbach v. Montefiore Med. Ctr.*, 81 F.4th 124, 140 (2d Cir. 2023). At a minimum, the Hilton Defendants were negligent in failing to ensure that the maintenance records and other relevant documents were preserved once litigation was initiated.[7]

---

[7] As a separate matter, a new trial is warranted only if an erroneous instruction caused prejudice. *See, e.g.*, *Zioness Movement Inc. v. Lawfare Project, Inc.*, --- F. Supp. 3d ---, ---, No. 21 Civ. 7429 (AKH), 2024 WL 3907277, at *4 (S.D.N.Y. Aug. 22, 2024) ("Inadequate jury instructions may constitute grounds for a new trial, provided the errors are 'prejudicial in light of the charge as a whole.'" (quoting *Lore*, 670 F.3d at 156)). The Hilton Defendants fail to explain how the spoliation instruction was "prejudicial in light of the charge as a whole"—except insofar as they groundlessly assert that "[t]he jury was told that it could fill the void of *Hilton* evidence through an adverse inference based on the *Moinian* defendants' conduct." Doc. 289 at 17. In fact, the jury was told nothing of the sort because the Hilton Defendants chose to litigate this case together with the Moinian Defendants. That is why the jury charge and the verdict form referred to all those entities collectively as "the Hotel Defendants."

In short, the spoliation instruction "was given after extensive consideration and was appropriately modeled, within the court's discretion, to:  deter future spoliation of evidence; protect the plaintiff's interests; and remedy the prejudice plaintiff suffered as a result of the defendant's actions."  *Pace v. Nat'l R.R. Passenger Corp.*, 291 F. Supp. 2d 93, 99 (D. Conn. 2003).  A new trial is not warranted on this ground.

### C.  Compensatory Damages

The next challenge concerns the compensatory damages award.  The Hilton Defendants argue that a new trial or remittitur is warranted because the jury's $1 million award to compensate Curtis for future pain and suffering was excessive.  Doc. 289 at 17.  (The Hilton Defendants do not contest the amounts awarded for past pain and suffering, future medical expenses, or future rehabilitation services.)

"Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial."  *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (citation omitted).  "In considering motions for a new trial and/or remittitur, '[t]he role of the district court is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered.'"  *Id.* (alteration in original) (quoting *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 435, (1996)).

New York law provides that "an award is excessive or inadequate if it deviates materially from what would be reasonable compensation."  N.Y. C.P.L.R. § 5501(c); *accord, e.g.*, *Allam v. Meyers*, 906 F. Supp. 2d 274, 286 (S.D.N.Y. 2012).  "Because New York trial courts apply § 5501(c), . . . so do federal district courts sitting in diversity."  *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 327 (S.D.N.Y. 2016) (citation omitted).  In evaluating whether a jury award is excessive under section 5501(c), "New York courts compare it with awards in similar cases, bearing in mind the unique facts and circumstances of each case."  *Doe v. Waltzer*, No. 21 Civ. 04332 (FB) (RML), 2024 WL

4216514, at *2 (E.D.N.Y. Sept. 17, 2024), *appeal filed*, No. 24-2493 (2d Cir. Sept. 24, 2024).  Since "the amount of damages to be awarded is primarily a question of fact for the jury, a court should exercise its discretionary remittitur power sparingly."  *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 436 (S.D.N.Y. 2008); *see also Geressy v. Digital Equip. Corp.*, 980 F. Supp. 640, 660 (E.D.N.Y. 1997) ("A general assumption under the Constitution that jury verdicts should stand unless there is a good reason to modify them, strongly suggests that the burden of proof should lie with the party challenging the verdict.  Without choosing a preponderance or a clear and convincing standard, it is enough to say for present purposes that the trial judge should feel an assurance that the verdict lies beyond the pale of non-material deviation before it is rejected.").

Curtis was forty-eight years old at the time of the accident.  Tr. 322.  She was an athlete and coach, a certified yoga instructor, and a mother of four children.  Tr. 322, 323–26, 339–40, 342.  Curtis suffered extensive injuries as a result of the door collapsing on her.  She requires ongoing spinal nerve ablations—which are extremely painful—and will need more in the future.  Tr. 403–04, 410–11.  Eventually, Curtis will likely require surgery to implant a spinal cord stimulator, as well as additional procedures to maintain the implant.  Doc. 295-1 at 297–301.  At the time of trial, Curtis had also undergone one knee surgery and required further procedures.  Tr. 259–60, 272–73.  One partial knee replacement has already taken place.  Doc. 296 at 10.  A total knee replacement will likely be necessary in the future.  Tr. 279–80; *see also* Tr. 640.  Curtis explained that because of her injuries, she is no longer able to participate in certain physical activities, is not able to work at her yoga studio as an instructor, and is "not the person [she] was" before the accident.  Tr. 336, 415–17.

The Court looks to similar cases—particularly in terms of the plaintiffs' injuries and future anticipated procedures—to determine whether the jury's $1 million award was reasonable.  *See Geressy*, 980 F. Supp. at 656 ("Cases with similar causal agents,

similarly-named diagnoses, or similar reductions in quality of life might serve as benchmarks."). *Pimenta v. 1504 CIA, LLC*, 153 N.Y.S.3d 129 (App. Div. 2021), provides a helpful point of reference. Plaintiff Mirson Pimenta, a forty-two-year-old construction worker, was injured on the job when an aluminum ladder fell and hit him in the back. *Id.* at 130. Pimenta suffered serious injuries to his spine and knees. *Id.* He underwent various spinal injections, spinal surgeries—including implantation of a spinal cord stimulator—cortisone injections to his knee, and arthroscopic knee surgery. *Id.* Those treatments "alleviated, but did not eliminate, [Pimenta's] pain and other symptoms and did not fully restore his strength or range of motion." *Id.* The evidence indicated that Pimenta would likely require future spinal surgeries and might need future knee surgeries as well. *Id.* at 130–31. The jury awarded Pimenta $2 million for past pain and suffering, as well as $15 million for future pain and suffering over a period of 33.3 years. *Id.* at 131. The trial court reduced those awards to $1 million for past pain and suffering and $2.25 million for future pain and suffering. *Id.* The Appellate Division affirmed, concluding that those reduced awards did not materially deviate from what would be reasonable compensation. *Id.*

Curtis received $1 million in future pain and suffering for comparable injuries and anticipated procedures. A review of New York cases involving similar or less extensive injuries and future treatment confirms that the award was reasonable. *See, e.g.*, *Stevens v. Bronx Cross Cnty. Med. Grp., P.C.*, 681 N.Y.S.2d 531, 532 (App. Div. 1998) (affirming $3 million award for past and future pain and suffering where plaintiff would require at least five or six more surgeries); *Dwyer v. Deutsche Lufthansa, AG*, 686 F. Supp. 2d 216, 218, 221 (E.D.N.Y. 2010) (reducing award to $2 million for future pain and suffering where plaintiff would require "extensive medication, physical therapy, and ambulatory aids for the remainder of his life"); *Bonano v. City of New York*, 4 N.Y.S.3d 174, 176 (App. Div. 2015) (affirming $1.14 million award for future pain and suffering where nineteen-year-old plaintiff would likely require further surgery and sustained some

permanent injuries); *Marcoux v. Farm Serv. & Supplies, Inc.*, 290 F. Supp. 2d 457, 475–79 (S.D.N.Y. 2003) (affirming $1 million award for future pain and suffering where plaintiff continued to experience pain and would be limited to part-time sedentary work in the future); *Smith v. Manhattan & Bronx Surface Transit Operating Auth.*, 872 N.Y.S.2d 107, 107–08 (App. Div. 2009) (affirming $800,000 award for future pain and suffering where plaintiff suffered severe damage to knee, underwent arthroscopic surgery, continued to experience chronic pain, and would likely require further surgical procedures, possibly including knee replacement); *Starr v. Cambridge Green Homeowners Ass'n, Inc.*, 751 N.Y.S.2d 640, 642 (App. Div. 2002) (affirming $750,000 award for future pain and suffering over twenty-nine years where plaintiff suffered swelling and constant pain in heel, would require total hip replacement surgery, and had arthritis in wrist that would continue to worsen over time); *Calzado v. N.Y.C. Transit Auth.*, 758 N.Y.S.2d 303, 304 (App. Div. 2003) (affirming $700,000 award for future pain and suffering over thirty-two years based on testimony that plaintiff would ultimately develop arthritis and require knee replacement surgery); *Cruz v. Manhattan & Bronx Surface Transit Operating Auth.*, 687 N.Y.S.2d 350, 351 (App. Div. 1999) (reducing future pain and suffering award from $1.9 million to $650,000 where thirty-year-old plaintiff sustained significant deterioration of knee cartilage, further arthroscopic surgery would not be beneficial, and knee replacement surgery might be warranted in the future); *Moorer v. City of New York*, 674 N.Y.S.2d 323, 324 (App. Div. 1998) (holding that $350,000—almost thirty years ago—was reasonable award for future pain and suffering where plaintiff required surgical replacement of one knee with likelihood of further surgery and had limited range of motion in that knee); *Hammond v. Welsh*, 815 N.Y.S.2d 147, 148 (App. Div. 2006) (affirming $275,000 award for future pain and suffering where plaintiff would likely require future knee replacement surgery); *Purkiss-Riddle v. N.Y.C. Transit Auth.*, 933 N.Y.S.2d 714, 715 (App. Div. 2011) (affirming $200,000 award for

future pain and suffering where sixty-nine-year-old plaintiff would require total knee replacement and arthroscopic surgery to repair torn tendon in shoulder).

The Hilton Defendants argue that the $1 million award in this case is "an outlier" compared to awards in cases involving comparable injuries. Doc. 289 at 17. The Court disagrees. The Hilton Defendants point to a handful of cases where plaintiffs were awarded $500,000 or less for future pain and suffering. *Id.* at 17–18 & n.10. But in several of these cases, the future surgical procedures contemplated were not as extensive as what Curtis was facing at the time of trial—that is, one spinal implant surgery, additional procedures to maintain the implant, and two knee surgeries. *See Gonzalez v. N.Y.C. Transit Auth.*, 929 N.Y.S.2d 159, 161–62 (App. Div. 2011) (affirming reduction of award for future pain and suffering from $1 million to $500,000 where plaintiff would likely require reconstructive knee surgery in the future); *Blair v. Coleman*, 180 N.Y.S.3d 233, 237 (App. Div. 2022) (reducing award for future pain and suffering from $840,000 to $500,000 where plaintiff "required surgery only for his injuries to his right foot"); *McEachin v. City of New York*, 25 N.Y.S.3d 672, 673–74 (App. Div. 2016) (reducing award for future pain and suffering from $500,000 to $350,000 where plaintiff had already undergone surgery to implant spinal cord stimulator and would need at least one total knee replacement in the future); *Zapata v. Yugo J&V, LLC*, 123 N.Y.S.3d 275, 281 (App. Div. 2020) (affirming awards of $200,000 and $150,000 to two individuals for future pain and suffering in opinion that did not reference any future surgeries).

At bottom, the Court's task is not "to ascertain an 'average' award based on comparable cases." *Okraynets*, 555 F. Supp. 2d at 439. Instead, the Court must "assess what amount is the 'highest amount of compensation allowable' based on the evidence, that would not deviate materially from reasonable compensation." *Id.* (citation omitted). Whatever the "highest amount of compensation allowable" may be based on the evidence here, the Court finds that $1 million is comfortably below that threshold. The motion for a new trial or remittitur of the compensatory damages award is denied.

### D. Punitive Damages

Both the Hilton and Moinian Defendants challenge the $30 million punitive damages award as well. They argue that joint and several punitive damages are improper and that the award is excessive.

### 1. Joint and Several Punitive Damages

The Hilton and Moinian Defendants first argue that the verdict form and jury charge improperly lumped the Hotel Defendants together for purposes of punitive damages. Doc. 289 at 18; Doc. 292 at 8. According to the Hilton and Moinian Defendants, this error warrants a new trial under New York law. Doc. 289 at 18; Doc. 292 at 8.

There is no dispute that the verdict form addressed punitive damages for the Hotel Defendants collectively. Doc. 267 at 2. It asked: "What amount, if any, do you award in punitive damages as to the Hotel Defendants?" *Id.* A single blank space was provided for the jury to enter its award. *Id.* The jury charge likewise discussed the Hotel Defendants together. The Court instructed the jury: "You may award Mrs. Curtis punitive damages if you find that the Hotel Defendants acted wantonly and recklessly." Tr. 742; *see also* Tr. 743–44.

There is also no dispute that the Hotel Defendants failed to raise this issue at trial. While they objected to the inclusion of a punitive damages charge, the Hotel Defendants never asked the Court to distinguish between the Hilton Defendants and the Moinian Defendants on the verdict form or in the jury charge. In fact, the Hotel Defendants' proposed verdict form provided, in relevant part:

> 6. You must assess a percentage of fault <u>only</u> to those parties you have found to be negligent (part "a") <u>and</u> whose negligence was a substantial factor in causing the occurrence (part "b").
>
>    Total must be 100%.
>
> a. Defendants, Hilton                                                    ____%
>
> b. Defendant, Kota DryWall Corp                              ____%
>
> c. Plaintiff Kim Curtis                                                  ____%

Doc. 186 at 9. The Hotel Defendants, then, raised no objection to the Court apportioning liability to all of them collectively—whether for compensatory damages or punitive damages. Curtis is therefore correct that the Hotel Defendants waived or forfeited this challenge to the punitive damages award and that the fundamental error standard applies. Doc. 296 at 17–18; *see also* Doc. 292 at 10 (invoking fundamental error standard).

As noted above, "[a]n error is fundamental when it is so serious and flagrant that it goes to the very integrity of the trial and includes an error which deprive[s] the jury of adequate legal guidance to reach a rational decision." *Webber*, 607 F. Supp. 3d at 415 (second alteration in original) (internal quotation marks and citation omitted). The fundamental error doctrine is even "narrower than the plain error doctrine applicable to criminal cases." *DeFalco v. Bernas*, 244 F.3d 286, 317 (2d Cir. 2001) (citation omitted).

The Second Circuit has explained that "[u]nlike . . . contradictory and confusing verdict sheet errors, a party's own strategic trial decisions and tactical trial choices do not provide a basis for concluding that that party has been a victim of fundamental error or a miscarriage of justice." *Salamone v. Douglas Marine Corp.*, 111 F.4th 221, 235 (2d Cir. 2024) (alteration and omission in original) (internal quotation marks and citations omitted). That principle applies with particular force here. The Hotel Defendants made a strategic choice to litigate this case together from the beginning. They answered the complaint together, participated in conferences together, and tried the case together. They shared the same counsel at each stage. The Hotel Defendants cannot now claim to have been the victims of fundamental error because their chosen strategy was unsuccessful. *See id.* at 236 (rejecting fundamental error claim where plaintiffs' summation "was confusing and contained misstatements that may have led directly to the jury's bottom-line calculation of damages").

The Second Circuit addressed a similar issue in *Motorola Credit Corp. v. Uzan*, 509 F.3d 74 (2d Cir. 2007). On appeal in that case, the defendants relied on Illinois law to argue that the joint and several punitive damages award was improper. *Id.* at 88. But

the defendants failed to raise that argument in the district court, so the Second Circuit declined to address it. *Id.* The court also concluded that considering the defendants' challenge to joint and several liability "would not . . . be necessary to avoid manifest injustice." *Id.* (internal quotation marks and citation omitted). The court explained: "The [defendants] are represented by sophisticated counsel, and they had ample opportunity properly to pursue the argument during these protracted proceedings. For their own reasons they opted not to do so." *Id.* As a result, the court affirmed the district court's judgment without deciding whether it was correct to order joint and several liability for punitive damages. *Id.*

Here too, the Hotel Defendants were represented by sophisticated and capable counsel throughout the proceedings. They had every opportunity to argue that grouping all the defendants together for purposes of the punitive damages charge was improper. They did not do so. Instead, the Hotel Defendants raised this issue for the first time after trial—and only after new counsel appeared on behalf of the Hilton Defendants. *Cf. Abel v. Town Sports Int'l, LLC*, No. 09 Civ. 10388 (DF), 2012 WL 6720919, at *20 (S.D.N.Y. Dec. 18, 2012) ("Plaintiff's contention that the omission was not only erroneous, but plainly or fundamentally so, strains credulity on a basic level, as Plaintiff's trial counsel did not notice the supposed error until several months after trial, and then only after consulting with new co-counsel."); *Galin v. Goldfischer*, No. 03 Civ. 9019 (RJS), 2008 WL 5484318, at *13 (S.D.N.Y. Dec. 31, 2008) (concluding that any error in the jury instructions was not "obvious" where it "was minor enough to escape the parties' attention during the trial and for three weeks *after* the jury's verdict"). After six years of the Hotel Defendants litigating this case together, the Court will not reward them with a new trial on this basis.[8]

---

[8] Both the Hilton and Moinian Defendants note that the Second Circuit raised the issue of joint liability for punitive damages *sua sponte* in *Smith v. Lightning Bolt Productions, Inc.*, 861 F.2d 363, 374 (2d Cir. 1988). But that case, unlike this one, does not appear to have involved a situation where the defendants made a strategic decision to litigate the case together, only to reverse course after the jury returned its verdict.

2. *Excessiveness*

Both the Hilton and Moinian Defendants argue that the $30 million punitive damages award was so excessive as to violate due process principles.  Doc. 289 at 19; Doc. 292 at 10.  They ask the Court to order a new trial or remittitur.  Doc. 289 at 19; Doc. 292 at 10.

The Supreme Court has held that "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003).  That is because "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose."  *Id.* (alteration in original) (citation omitted).

"Under New York law, moreover, courts have the authority to review any damages award even in the absence of a constitutional violation."  *Koch v. Greenberg*, 14 F. Supp. 3d 247, 274 (S.D.N.Y. 2014).  "New York courts may not reduce a punitive damages award unless it 'is so grossly excessive as to show by its very exorbitancy that it was actuated by passion.'"  *Id.* (quoting *West v. Hogan*, 930 N.Y.S.2d 708, 712 (App. Div. 2011)).  A court reviewing a punitive damages award "must consider whether the punishment is 'reasonably related to the harm done and the flagrancy of the conduct.'" *Id.* (citation omitted).  "The wealth of the defendant is also relevant, because a defendant's ability to pay impacts whether damages are sufficient to function as a punishment and a deterrent."  *Id.*  In sum, these factors inform the Court's determination as to whether the award "is so exorbitant as to show that it was motivated by passion." *Id.*

Following the Supreme Court's command, courts consider "three guideposts for evaluating when the amount of punitive damages becomes so excessive that it crosses the line into arbitrariness, violating due process."  *Gilead Cmty. Servs., Inc. v. Town of*

*Cromwell*, 112 F.4th 93, 104 (2d Cir. 2024) (citing *State Farm*, 538 U.S. at 419–28, and *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–85 (1996)).  The first guidepost is "the reprehensibility of the defendant's conduct," which is "[t]he most important indicium of the reasonableness of a punitive damages award."  *Id.* at 104–05 (alteration in original) (quoting *Gore*, 517 U.S. at 575).  The second is the "ratio between harm, or potential harm, to the plaintiff and the punitive damages award," which is "often captured as the ratio of punitive to compensatory damages."  *Id.* at 105 (quoting *State Farm*, 538 U.S. at 424).  The final guidepost is "the disparity between the punitive damages award and the civil penalties authorized or imposed in comparable cases."  *Id.* (quoting *State Farm*, 538 U.S. at 428).

With respect to the first guidepost, the conduct in this case was sufficiently reprehensible to justify a large punitive damages award.  In assessing reprehensibility, courts evaluate whether:

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Thomas v. iStar Financial, Inc.*, 652 F.3d 141, 148 (2d Cir. 2011) (quoting *State Farm*, 538 U.S. at 419).

Several of those factors support a significant award.  For one, the harm caused was physical—and it was severe.  Curtis suffered devastating injuries as a result of the Hotel Defendants' negligence.  The Hotel Defendants' conduct also showed a reckless disregard for the health and safety of hotel guests.  The problems with the barn doors were extensive and well documented, yet the Hotel Defendants failed to take any meaningful steps to warn guests of the danger or to remediate the harm until over a year had passed.  Nor was this an isolated incident:  there were numerous issues with the

doors, which were the hotel's "number one" deficiency according to its chief engineer.[9]
The Hotel Defendants' actions endangered the health and safety of not only the Curtises
but also every guest who stayed at the hotel while the issues with the doors persisted.
These factors all suggest that the Hotel Defendants' behavior was highly reprehensible.
*See Izzarelli v. R.J. Reynolds Tobacco Co.*, No. 99 Civ. 2338 (SRU), 2018 WL 6575458,
at *7 (D. Conn. Dec. 13, 2018) (finding that reprehensibility of conduct warranted
substantial punitive damages award where defendant recklessly disregarded health and
safety of consumers, which resulted in "extreme adverse health effects" to plaintiff);
*Davids v. Novartis Pharms. Corp.*, 977 F. Supp. 2d 171, 182 (E.D.N.Y. 2013) (concluding
that sufficient evidence was presented at trial to support finding that conduct was
reprehensible where harm caused was physical and defendant "irresponsibly delayed" in
alerting patients of danger).[10]

   *Mathias v. Accor Economy Lodging, Inc.*, 347 F.3d 672 (7th Cir. 2003), is
instructive. There, an extermination service discovered bedbugs in several rooms at the
defendant motel. *Id.* at 674. Several guests reported bedbug incidents, but management
failed to take action. *Id.* The infestation "began to reach farcical proportions": one guest
who complained of bedbugs was moved to two different rooms, each time to find that the
new room was infested as well. *Id.* at 675. The motel even rented rooms that were on
"Do not rent, bugs in room" status. *Id.* The jury awarded each of the two plaintiffs
$5,000 in compensatory damages and $186,000 in punitive damages (a 37.2-to-1 ratio).
*Id.* at 674.

---

[9] Of course, the Court cannot ascertain the full extent of what the Hotel Defendants knew—and just how serious the problems were—because of the spoliation that occurred.

[10] *See also Small v. New York State Dep't of Corr. & Cmty. Supervision*, No. 12 Civ. 1236 (WMS), 2019 WL 1593923, at *14 (W.D.N.Y. Apr. 15, 2019) (finding that conduct was sufficiently reprehensible to justify punitive damages award where defendant's conduct caused both psychological and physical harm); *cf. Gore*, 517 U.S. at 576 (finding conduct insufficiently reprehensible where harm was purely economic and conduct did not evince indifference to or reckless disregard for health and safety of others).

The Seventh Circuit upheld the award. Writing for the court, Judge Posner explained that the motel "may well have profited from its misconduct because by concealing the infestation it was able to keep renting rooms." *Id.* at 677. "Refunds were frequent but may have cost less than the cost of closing the hotel for a thorough fumigation." *Id.* "All things considered," the court could not conclude that the punitive damages award was excessive. *Id.* at 678.

Here too, the Hotel Defendants were aware of an issue that seriously threatened the health and safety of their guests. The barn door issues might not have approached the "farcical" proportions in *Mathias*, but they were undoubtedly pervasive. And the physical threat was far greater, as Curtis's injuries illustrate. Customers almost certainly would not have paid the hotel's rates if they knew that they might be seriously injured by a defective door. *See id.* at 675 ("Motel 6 could not have rented any rooms at the prices it charged had it informed guests that the risk of being bitten by bedbugs was appreciable."). In short, the Hotel Defendants' reckless disregard for guest safety warrants a substantial punitive damages award.

The second guidepost focuses on the proportionality of the award. This analysis often turns on the ratio of punitive damages to compensatory damages and "whether that ratio is reasonable in the circumstances of the case." *Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013). The Supreme Court suggested in *State Farm* that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." 538 U.S. at 425. But the Court explicitly declined "to impose a bright-line ratio which a punitive damages award cannot exceed." *Id.*; *see Mathias*, 347 F.3d at 676 (explaining that the Court did not "lay down a 4-to-1 or single-digit-ratio rule . . . and it would be unreasonable to do so"). As the Second Circuit has observed, "the propriety of the ratio can vary enormously with the particular facts of the case." *Payne*, 711 F.3d at 102; *see also, e.g.*, *Gilead*, 112 F.4th at 106 (noting that where a defendant's conduct inflicts "non-economic harms that may not be easily quantifiable,"

"even a relatively high ratio of punitive to compensatory damages can survive constitutional scrutiny").  "In most cases, the ratio will be within a constitutionally acceptable range, and remittitur will not be justified on this basis."  *Gore*, 517 U.S. at 583.

In this case, the ratio of punitive damages to compensatory damages is approximately fourteen to one ($30 million in punitive damages and $2.1 million in compensatory damages).  The Hilton Defendants assert that "circuit precedent requires reducing the punitive award to no more than twice the amount of the compensatory award, and no more than a 1:1 ratio when compensatory damages are high."  Doc. 289 at 22 (citing *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014)).  Similarly, the Moinian Defendants contend that the Court should reduce the award to "a figure less than or equal to" compensatory damages.  Doc. 292 at 14.

These arguments are not persuasive.  For one, the fourteen to one ratio in this case does not exceed single digits "to a significant degree."  *State Farm*, 538 U.S. at 425.  The *State Farm* decision highlighted the excessiveness of ratios in the triple digits.  The Supreme Court explained that "[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1 or, in this case, of 145 to 1."  *Id.* (internal citation omitted).  The ratio here is not far off from single digits; it is nowhere close to the triple digit ratios that the Court found excessive.  *See Kennedy v. Supreme Forest Prods., Inc.*, 295 F. Supp. 3d 113, 122 (D. Conn. 2017) (finding that approximate 21-to-1 ratio was permissible and noting that it fell "far short" of the 500-to-1 ratio in *Gore* and the 145-to-1 ratio in *State Farm*).

The Second Circuit precedent cited by the Hilton Defendants does not "require" the Court to reduce the award either.  In *Turley*, the Second Circuit upheld a $1.32 million compensatory damages award while acknowledging that it "test[ed] the boundaries of proportionality and predictability."  774 F.3d at 163.  Then, in evaluating the reduced $5

million punitive damages award, the court explained:  "Where the compensatory award is particularly high, as the one in this case assuredly was, a four-to-one ratio of punishment to compensation, in our view, serves neither predictability nor proportionality."  *Id.* at 165.  That was especially true because the underlying compensation was for "intangible—and therefore immeasurable—emotional damages."  *Id.*  By contrast, the compensatory damages for physical harm in this case are well within the range of permissible awards for the reasons discussed above.  In other words, this is not a case where compensatory damages "test the boundaries of proportionality and predictability."

The Supreme Court's discussion of the compensatory damages award in *State Farm* further illustrates the point.  The plaintiffs in that case were awarded $1 million for "a year and a half of emotional distress."  538 U.S. at 426.  The Court emphasized that "[t]he harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm paid the excess verdict before the complaint was filed, so the [plaintiffs] suffered only minor economic injuries for the 18-month period in which State Farm refused to resolve the claim against them."  *Id.*  The $2.1 million compensatory damages award in this case—for severe physical injuries spread over decades of expected pain and suffering—is not "particularly high" so as to preclude any specific ratio.

In evaluating proportionality, the Court must also consider the "potential harm" suffered by the plaintiff.  *Kennedy*, 295 F. Supp. 3d at 122 (emphasis omitted) (citing *State Farm*, 538 U.S. at 418).  The *Kennedy* court noted that it was "no more than happenstance" that the plaintiff's compensatory damages were not higher.  *Id.*  Likewise, Curtis's injuries, while already severe, could have been even more extensive given that a heavy bathroom door crushed her knee and caused serious damage to her spine.  If Curtis's compensatory damages had been $1 million higher, the ratio would have dropped into the single digit range.  That "happenstance" does not mandate a reduction.  *See id.*

All told, the fourteen to one ratio in this case does not necessarily require that the Court reduce the punitive damages award.

The final guidepost concerns "comparable civil penalties and similar cases." *Koch*, 14 F. Supp. 3d at 278. The parties have not identified any comparable civil penalties for the Court's consideration. They focus instead on purportedly similar cases. As the Moinian Defendants concede, however, "there is a paucity of punitive awards for personal injuries reviewed under CPLR 5501(c) and the Due Process Clause." Doc. 292 at 14.[11]

The largest punitive damages award in the cases cited by the Hotel Defendants came in *In re 91st Street Crane Collapse Litigation*, 62 N.Y.S.3d 11 (App. Div. 2017). There, the court found that the plaintiffs' deaths "arose from a series of calculated decisions made by [one defendant] over a period of months, during which time [the defendant] placed profit over the safety of construction workers and the public, despite having multiple opportunities to change course." *Id.* at 24. The jury awarded $24 million in punitive damages to each of the two plaintiffs. *Id.* at 21. The court reduced the awards to $8 million and $9.5 million, explaining that those figures were "sufficient to punish defendants and deter future misconduct" while not "run[ning] afoul of constitutional standards." *Id.* at 25.

The Court agrees with the Hotel Defendants that their behavior was not as reprehensible as the defendants in *Crane Collapse Litigation*, whose misconduct resulted in the deaths of the two plaintiffs. But there is no doubt that the Hotel Defendants' conduct was incredibly reckless and resulted in life-altering injuries to Curtis. And it is certainly possible that even more serious injuries could have occurred as a result of the

---

[11] The parties dispute whether CPLR section 5501(c) applies to punitive damages. Doc. 296 at 42; Doc. 299 at 3. Other courts have noted that there is "conflicting persuasive authority" on that question. *Koch*, 14 F. Supp. 3d at 274 n.17. Regardless, courts tend to consider "similar cases" anyway. *See, e.g.*, *id.* at 278; *Greenaway*, 327 F. Supp. 3d at 571. And the Court would reach the same result under CPLR section 5501(c).

Hotel Defendants' blatant disregard for guest safety. *Cf. id.* at 24 ("That there were no more lives lost and/or property damaged is something of a miracle."). A multimillion-dollar punitive damages award is warranted based on the Hotel Defendants' conduct.

The fact that the punitive damages award in *Crane Collapse Litigation*—$17.5 million in total—was lower than the award here does not necessarily require remittitur. An evaluation of "similar cases" is one guidepost that the Court must consider along with reprehensibility and proportionality. The Court is also mindful that because "there are no punitive-damages guidelines, corresponding to the federal and state sentencing guidelines, it is inevitable that the specific amount of punitive damages awarded whether by a judge or by a jury will be arbitrary." *Mathias*, 347 F.3d at 678. "The judicial function is to police a range, not a point." *Id.* An award is not automatically outside the permissible range simply because another jury awarded a lower sum in a case that might have involved more egregious wrongdoing. *Cf. Payne*, 711 F.3d at 104–05 (noting that while courts have often found it helpful to compare punitive damages awards across cases, "[t]he undertaking is precarious because the factual differences between cases can make it difficult to draw useful comparisons").

The Hotel Defendants cite several other cases in which they assert that plaintiffs suffered greater harm or death. "The purpose of punitive damages," however, "is not to compensate the plaintiff but to punish the defendant for (wanton and reckless, malicious) acts and thereby to discourage the defendant and other (people, companies) from acting in a similar way in the future." *Crane Collapse Litig.*, 62 N.Y.S.3d at 24 (citation omitted). The Court concludes that a significant punitive damages award is justified to sufficiently deter the Hotel Defendants from engaging in similar misconduct again. *See Izzarelli*, 2018 WL 6575458, at *8 ("It comes as no shock that Reynolds is a wealthy company, and therefore, a nominal punitive damages award would not serve to deter such wrongful behavior in the future."); *Koch*, 14 F. Supp. 3d at 278 ("To deter individuals in this rarefied class, a punitive damages award less than or equal to the compensatory

figure would likely have limited deterrent effect."); *cf. Mathias*, 347 F.3d at 677 ("The award of punitive damages in this case thus serves the additional purpose of limiting the defendant's ability to profit from its fraud by escaping detection and (private) prosecution. If a tortfeasor is 'caught' only half the time he commits torts, then when he is caught he should be punished twice as heavily in order to make up for the times he gets away.").

"[I]n the absence of comparable cases upon which the Court can rely, the Court is left to be guided by the principle that courts should endeavor to be the 'most faithful to the jury's verdict.'" *Greenaway*, 327 F. Supp. 3d at 569 (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990)). And "the Court should remit the jury's award to the maximum amount that would not be excessive." *Chisholm v. Memorial Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 579 (S.D.N.Y. 2011) (citation omitted). In light of the three guideposts and other relevant considerations discussed above, the Court will remit the punitive damages award to $10 million, reflecting a punitive damages to compensatory damages ratio of approximately five to one—well within the range that the Supreme Court and the Second Circuit have found constitutionally acceptable. If Curtis does not accept the reduced award, a new trial on punitive damages will be held. *See, e.g.*, *Koch*, 14 F. Supp. 3d at 279 (offering reduced award or new trial).

### E. Kota's Exclusion from the Verdict Form

The final issue is the exclusion of Kota Drywall from the verdict form. Relying on CPLR section 1601, the Moinian Defendants—joined by the Hilton Defendants— argue that Kota should have appeared on the verdict form as a party to whom the jury could apportion fault. Doc. 292 at 17; *see* Doc 289 at 24 & n.15. In their view, the omission warrants a new trial. Doc. 292 at 17.

In New York, "a joint tortfeasor [may] be held liable for the entire judgment, regardless of its share of culpability." *Avis Budget Car Rental, Inc. v. JD2 Env't, Inc.*, No.

12 Civ. 5010 (PKC) (ST), 2018 WL 1175709, at *2 (E.D.N.Y. Mar. 6, 2018) (alteration in original) (quoting *Rangolan v. County of Nassau*, 749 N.E.2d 178, 181 (N.Y. 2001)). "The only exception to joint and several liability in New York is contained in Article 16 of the [CPLR]." *Id.*

> CPLR section 1601(1) provides:
>
>> [W]hen a verdict or decision in an action or claim for personal injury is determined in favor of a claimant in an action involving two or more tortfeasors jointly liable or in a claim against the state and the liability of a defendant is found to be fifty percent or less of the total liability assigned to all persons liable, the liability of such defendant to the claimant for non-economic loss shall not exceed the defendant's equitable share determined in accordance with the relative culpability of each person causing or contributing to the total liability for non-economic loss . . . .

Under Article 16, "a negligent joint tortfeasor whose fault is less than or equal to 50% of a plaintiff's non-economic loss may only be held liable for a share of that loss equal to the tortfeasor's percentage of fault." *Mitrione ex rel. Brittany v. Monroe*, No. 02 Civ. 0526 (LEK) (RFT), 2010 WL 1539719, at *5 (N.D.N.Y. Apr. 19, 2010); *see also Bifaro v. Rockwell Automation*, 269 F. Supp. 2d 143, 146 (W.D.N.Y. 2003) (explaining that with the enactment of Article 16, "a joint tortfeasor can now limit its liability for non-economic losses to its proportional share upon proof that it is fifty percent or less culpable for the plaintiff's injury"). This limitation protects defendants "from being held liable for the full amount of a judgment when their actual percentage of fault was small." *Bifaro*, 269 F. Supp. 2d at 146. But the limitation does not apply to "defendants who satisfy one or more of the various exemptions set forth in CPLR § 1602." *Id.* That provision includes an exemption for "any person held liable for causing claimant's injury by having acted with reckless disregard for the safety of others." CPLR § 1602(7).

The parties' dispute boils down to whether CPLR section 1602(7) applies here. Under CPLR section 1603, a party asserting that Article 16's limitations on liability do not apply must "allege and prove by a preponderance of the evidence that one or more of

the exemptions set forth in [section 1601(1) or section 1602] applies." The Moinian
Defendants contend that Curtis waived any reliance on section 1602 by failing to plead a
specific exception. Doc. 292 at 19.

Curtis asserted in the complaint that "[t]he limitations set forth in Article 16 of the
New York CPLR do not apply to this case." Doc. 1 ¶ 19. Under New York pleading
standards, this assertion—which did not identify a specific exception—may not have
been sufficient. *See, e.g.*, *Cole v. Mandell Food Stores, Inc.*, 710 N.E.2d 244, 245 (N.Y.
1999) ("Pursuant to CPLR 1603, a party asserting an exception to article 16 has the
affirmative obligation of pleading and proving *that exception* by a preponderance of the
evidence." (emphasis added)).[12]

At the same time, New York courts have recognized that "CPLR 1603 can be
'procedurally awkward' for plaintiffs." *Id.* at 246 (citation omitted). "Requiring a
plaintiff to 'allege and prove' an exception to CPLR 1601(1) 'would require the plaintiff
to anticipate defendant's invocation of the Article 16 defense, which may not be
possible.'" *Id.* (citation omitted). "Since CPLR 1603 does not articulate when a plaintiff
must plead an exception to CPLR 1601(1) and, in keeping with the liberal rules of CPLR
3025, courts have generally permitted plaintiffs to amend the pleadings at various points
throughout an action in order to comply with CPLR 1603." *Id.* The *Cole* court ultimately
concluded that the plaintiff could not introduce on appeal an exception that had never
been pleaded because doing so would prejudice the defendant. *Id.* Specifically, the
plaintiff's "novel" argument that the defendant breached a nondelegable duty "was never
raised or argued at any point during trial." *Id.*

---

[12] Curtis argues that the CPLR section 1603 pleading standard "constitutes a procedural rule that does not
apply in federal court under well-established *Erie* principles." Doc. 296 at 44. Under the pleading
standards set out in Federal Rules of Civil Procedure 8 and 9, she reasons, her complaint's assertion that the
limitations of Article 16 do not apply would be sufficient. *Id.* at 44–45. The Moinian Defendants do not
respond to that argument. In any event, the Court need not resolve the issue because, as discussed below,
Curtis is entitled to rely on the CPLR section 1602(7) exception even if the New York pleading standard
applies.

Here, by contrast, the complaint alleged that Curtis was injured by the "negligence and/or recklessness" of the Hilton and Moinian Defendants.  Doc. 1 ¶ 18.  The recklessness theory was included in the complaint, argued at trial, and decided by the jury.  *See* Doc. 267 at 2 (answering "Yes" to question on verdict form that asked:  "Has Mrs. Curtis proven by a preponderance of the evidence that the Hotel Defendants acted wantonly and recklessly?").  New York courts have permitted plaintiffs to amend their complaint to assert a specific exception where, as here, doing so would not prejudice the defendants.  *See Lisa I. v. Manikas*, 135 N.Y.S.3d 192, 196 (App. Div. 2020) (affirming grant of leave to amend and explaining that "defendants cannot claim surprise as plaintiff previously alleged reckless disregard for the safety of others"); *Miller v. Staples Off. Superstore E., Inc.*, 860 N.Y.S.2d 51, 55 (App. Div. 2008) (finding that "none of the concerns that were present in *Cole*" existed where defendants "were never at risk of being caught off guard by plaintiff's failure to invoke an exception to apportionment"); *In re N.Y.C. Asbestos Litig.*, 960 N.Y.S.2d 51, 2012 WL 3642303, at *16 (N.Y. Sup. Ct. 2012) (rejecting defendant's claims of prejudice where complaint alleged recklessness and record indicated that defendant "was aware that recklessness was alleged and during trial argued that certain evidence was relevant to this issue"); *Rubinfeld v. City of New York*, 652 N.Y.S.2d 688, 690 (N.Y. Sup. Ct. 1996) ("In light of the liberal emendation rules of § 3025 which govern Article 16 issues, and because the Article 16 issues were extensively argued during trial, the plaintiff's complaint is hereby deemed to have been amended to include the allegation that the exception carved out in § 1602(2) [iv] for non-delegable duties precludes the application of Article 16 to the defendant City.").

The court's decision in *Rangolan v. County of Nassau*, 51 F. Supp. 2d 233 (E.D.N.Y. 1999), is illustrative.  The question before the court was whether the plaintiffs should be permitted to amend their complaint at the close of evidence to add the "nondelegable duty" exception in CPLR section 1602(2)(iv).  *Id.* at 233.  The court concluded that "granting the plaintiffs leave to amend their complaint so as to include the

'nondelegable duty' exception would be in furtherance of the liberal interpretation adopted by this Circuit in conjunction with Rule 15 of the Federal Rules of Civil Procedure, and equally important, in the furtherance of justice." *Id.* at 234–35. The court also noted that the defendants "would not be unfairly prejudiced" by the amendment because closing arguments had not yet taken place, and the court did "not believe that the defendants' trial strategy would have been altered had the plaintiffs pled this exception from the time they first filed their complaint." *Id.* at 235. In short, the nondelegable duty issue had been "at the very core of this trial." *Id.*

Here too, the Hotel Defendants cannot claim to have been unaware that Curtis was pursuing a recklessness theory. While closing arguments have come and gone, there is no reason to think that the Hotel Defendants would have altered their trial strategy if the recklessness exception had been specifically identified in the complaint—especially since the complaint included allegations of recklessness. As in *Rubinfeld*, therefore, the Court will deem the complaint to have been amended to include the allegation that the exception in CPLR section 1602(7) precludes the application of Article 16. *See* 652 N.Y.S.2d at 690.

Aside from the pleading dispute, the Moinian Defendants return to the argument that any recklessness finding by the jury was not made on a defendant-by-defendant basis. Doc. 292 at 20 n.4; Doc. 299 at 8–9. On their account, the verdict form does not indicate whether the jury found that the Moinian Defendants acted recklessly, so the Court cannot determine whether the section 1602(7) exception applies to them. Doc. 299 at 8–9.

This argument fails as well. The Moinian Defendants never requested a defendant-by-defendant charge on the issue of recklessness. They cannot now benefit from their failure to do so by asserting that the jury's verdict is vague as to whether individual defendants acted recklessly. The Hotel Defendants litigated this case collectively—and the jury found that all of them, collectively, were reckless. That

conclusion is well supported by the evidence in the record.  The Moinian Defendants owned the hotel and indisputably had knowledge of issues with the barn doors.  The same is true of the Hilton Defendants for the reasons already detailed.  Accordingly, the exception in CPLR section 1602(7) applies, and the Hotel Defendants are not entitled to apportionment based on Kota's negligence.  The motion for a new trial on this basis is denied.

### F.  Certification of the Verdict

Lastly, Curtis asks the Court to certify the verdict as final.  Doc. 296 at 48.  The Hotel Defendants appear not to oppose this request.  The Court will not enter final judgment, however, unless Curtis accepts the reduced punitive damages award.  *Cf. Koch*, 14 F. Supp. 3d at 287 (directing plaintiff to inform court whether he would accept reduced punitive damages award and stating that "[i]f he does so, an appropriate order directing entry of final judgment will be issued").

### III.    CONCLUSION

For the foregoing reasons, the Hilton Defendants' and Moinian Defendants' posttrial motions are GRANTED IN PART and DENIED IN PART.  The motions for remittitur of the punitive damages award are GRANTED.  The other motions are DENIED.

Curtis shall advise the Court by November 11, 2024, whether she accepts the reduced punitive damages award of $10 million.  If she accepts that amount, the Court will enter final judgment.  If she does not, the Court will hold a new trial on punitive damages.

The Clerk of Court is respectfully directed to terminate the motions, Docs. 287, 290.

It is SO ORDERED.

Dated:    November 1, 2024
          New York, New York

_____

EDGARDO RAMOS, U.S.D.J.